UNITED STATES of America, Appellee,

v.

John H. Perry HOOKER,
Defendant-Appellant.

No. 75–1415.

United States Court of Appeals,
First Circuit.

Argued June 3, 1976.

Decided Sept. 7, 1976.

Paul E. Kennedy, Boston, Mass., with whom John A. Burgess Associates, Ltd., Montpelier, Vt., were on brief, for defendant-appellant.

· Charles E. Chase, Asst. U.S. Atty., Boston, Mass., with whom James N. Gabriel, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

After a jury trial appellant was convicted on a 29 count indictment charging him with distributing and conspiring to distribute prescriptions for controlled substances in violation of 21 U.S.C. §§ 841 and 846 (1970).[1] Appellant now challenges the sufficiency of the evidence and also claims that the prosecutor's comments on the evidence in his closing argument were prejudicial. Our analysis of these claims requires fur-

---

1. The first two counts of the indictment charged conspiracies under 21 U.S.C. § 846. At the conclusion of the evidence the district court concluded that there was support for only a single conspiracy charge and directed the government to elect to proceed to the jury on one of the two counts. The government chose to proceed on the first count and the court granted a motion of acquittal as to the second.

**302**

ther examination of the factual circumstances of this case.

Appellant is a licensed physician who was engaged in the practice of psychiatry in the Beacon Hill section of Boston in 1973. His codefendant, Donahue, who was a graduate student in psychology, worked in his office as a receptionist. The government's case rested primarily on the testimony of five undercover agents of the Drug Enforcement Administration, four of whom had obtained prescriptions from appellant. Agent Doyle testified that on January 22, 1973, he went to appellant's office [2] and advised the receptionist that he wanted to see the doctor. Donahue gave him various forms [3] to be filled out. When Doyle asked why he had to complete the rather lengthy series of questions he was told that "the forms were to cover the doctor's ass," and "were protection against the police, to stop them from taking his license . . . [which] was like gold." After completing the forms Agent Doyle was directed to appellant's office. Upon inquiry as to the purpose of his visit Doyle stated that he wanted some "bombers" (a slang term for certain drugs). Doyle testified that appellant asked if he knew the pharmaceutical name for the drug. Doyle said that he did not but that he had been given the pills at a party and that they had enabled him to stay up all night. Appellant replied that Doyle was probably referring to "speed." The agent told the doctor that the friend who had given him the "bombers" had referred him to appellant's office. Doyle gave appellant the friend's name and the doctor called on the intercom for that individual's file, explaining that "by referring to the . . . file, he could find out the correct name of the drug. . . ." The receptionist then entered with a file and whispered to appellant who thereupon jumped up and told Doyle to "get out of the office" and not to return. Doyle testified that the

doctor said that he had already been contacted by the "feds" and that "they told him that he was only supposed to dispense speed to people who wanted to lose weight." The agent left the office. On redirect Doyle also testified that appellant had asked no questions relating to the forms the agent had been requested to fill out.

Agent Girard went to appellant's office on February 5. He was also asked to fill out the forms, and upon completing this task met with the doctor. Girard testified that appellant asked him what he wanted and that he answered "some pills." Appellant inquired why Girard sought the pills and was told "they ma[k]e me feel good." The doctor then "asked . . . what kind of pills . . ., and . . . mentioned a couple of examples [such as] demerol and desbutal." Girard expressed a preference for the latter. Appellant asked if Girard knew what desbutal looked like. The doctor picked up a book, showed Girard a page with "several colored pictures of different kinds of capsules and pills," and asked "if any of them looked familiar." Girard pointed out a black capsule, and said that he previously had tried one, had liked its effect and would be happy with more. Appellant advised Girard that the capsule in question was biphetamine, that state laws were very strict concerning the dispensing of "speed", and that biphetamine was usually prescribed for weight control. Appellant took Girard's picture for the files and then began writing a prescription. While writing the doctor asked Girard whether he had a problem with his weight. He replied "You name it and I've got it." The agent was given the prescription and paid appellant ten dollars. He testified that the doctor did not weigh him. Girard returned on March 6 and told appellant that he had "no problems" but "just wanted more pills." The doctor said "okay," took

2. Appellant made a point at trial of the fact that no record of Agent Doyle's visit was ever produced although the government had introduced patient records of the visits of the four other agents.

3. The forms requested basic background information and personal history and included a psychological questionnaire involving, e. g., open-ended sentences to be completed, requests to draw a person, etc.

out a prescription pad and began writing. The doctor gave Girard a prescription and the agent paid him ten dollars.

On April 9, 1973, Girard again went to appellant's office. The doctor asked what he desired and Girard said that he wanted both "ups" and "downs" this time. Girard testified that appellant said he would write a prescription for desbutal and that for "downs" he could have either seconal, tuinal, nembutol, or quaalude. Girard stated he did not want the latter because several friends had overdosed on it. Appellant then gave the agent two prescriptions, one for seconal and the other for desbutal. Girard asked appellant if he had received the fifteen dollars he had paid the receptionist and the doctor responded affirmatively.

On April 11 Girard returned and informed the receptionist that he was unable to have the desbutal prescription filled [4] and that he would therefore like a prescription for either desoxyn or dexedrine. Donahue took the desbutal prescription into the doctor's office and returned in a few minutes with one for desoxyn which he gave to the agent. On May 15 Girard came to appellant's office in the company of Agent Barton. Appellant asked Girard what he wanted "that day" and he said that "more of the same would be fine." The doctor checked Girard's folder and again wrote out two prescriptions for desoxyn and seconal. He paid ten dollars and asked if appellant would see his "friend" [Barton]. The doctor inquired as to how long Girard had known the friend; the agent said six months, and appellant agreed to see him. Barton went in, was told that he would have to fill out some forms, and that he should return on May 21.

He went to the office on that date, completed the forms and asked appellant for "some pills." When the doctor inquired as to what kind, Barton replied: "tuinal or seconal." Appellant asked why he wanted them and advised that some people take pills to get "high," but that was not a valid medical reason. Barton stated that he did not care why the doctor gave him the pills. He testified that he told appellant that he did not want to lie, and that he probably would take them to get "high." Appellant replied that he would not give the pills for him to get high but would provide them for use in getting to sleep. Barton stated that the doctor then said: "I guess you can have some Tuies." Barton was given a prescription for tuinal and paid the doctor ten dollars.

Agent Girard returned to the doctor's office on June 21 and was again given prescriptions for desoxyn and seconal. Agent Barton returned to appellant's office on June 27 seeking more pills. He testified that during this meeting he asked appellant if it "would make him mad if I told him I was going to take them to get high," and that appellant said "No, it wouldn't make him mad, but that wasn't a legitimate medical reason for writing the prescription, [and] that he would write . . . a prescription for sleep." Barton received a prescription for tuinal for which he paid ten dollars. Agent Girard returned on July 31 in the company of Agent Gamble. After briefly reviewing Girard's file the doctor wrote out the usual two prescriptions for desoxyn and seconal. Girard paid him ten dollars and asked if he would see Gamble who was in the waiting room. Appellant said he was booked until Labor Day, but after Girard persisted the doctor gave him a set of forms for Gamble to complete. Gamble filled in the forms, and was asked by appellant what he wanted. The agent asked for "ups" and "downs," and when queried as to the purpose replied that he enjoyed taking them. Appellant stated that this was not a valid medical reason; Gamble answered that he understood, but that he "liked the feeling [he] got from them." Appellant then asked what Gamble had in mind, and was told desoxyn and seconal. The doctor wrote out a prescription for each of these types of pills. Gamble paid the requested ten dollars. On August 7, 1973, Barton returned accompanied

---

**4.** Effective March 30, 1973, the Food and Drug Administration withdrew its approval of the manufacture and use of certain drugs containing methamphetamine, such as desbutal.

by Agent Yout. Barton did not have an appointment and the receptionist informed him it would cost an extra five dollars. The agent agreed, and then met with appellant. The doctor asked if Barton wanted some more tuinal. The agent responded affirmatively and added that he also wanted some "uppers." Barton testified that appellant then explained that "there were three available Desbutal, Desoxyn, and Dexedrine," and that the first had a barbituate, the second "had a pretty hard kick," and that the third was "somewhere in the middle." The agent told the doctor he did not want too hard a "kick" and asked for dexedrine. Appellant wrote a prescription for this drug and for tuinal. Barton paid appellant fifteen dollars. Yout also met with the doctor and told him he wanted "some pills to make me feel good and high." Yout testified that appellant then said "the kids usually wanted Desoxyn, Desbutal, or Dexedrine, and that those drugs are very popular on the streets." Yout requested and received a prescription for dexedrine. Appellant refunded five of the twenty dollars previously paid to the receptionist, and also took a snapshot of Yout for his files.

On September 6 Agent Girard visited appellant's office and observed the doctor talking with an unknown individual. Girard testified that he overheard the doctor say "something to the effect of 'You have seen examples of my creative writing act.'" The individual replied that some pharmacists do not find it "that creative" and will not fill prescriptions. Appellant replied that it was always possible to "find some pharmacist that will fill it." Girard told the doctor that he wanted more of the pills he had received last time. Appellant asked whether the pills had been taking care of Girard's problems. The agent answered that they made him feel "very good and very high." Appellant said "That's good" and wrote out two prescriptions, again for desoxyn and seconal, for which the agent paid ten dollars.

Agent Barton again visited appellant's office on September 19. Appellant asked if he wanted the same pills as last time; the agent responded affirmatively and was given prescriptions for tuinal and dexedrine. At a visit on October 2 Agent Yout testified that he asked for more dexedrine and also told appellant that he "wanted some reds" (a slang term for seconal). The doctor did not answer but just wrote out two prescriptions, one for dexedrine and the other for seconal. Yout testified further that appellant told him that he would not be able to come back for at least six weeks because there was "too much heat in the area."

Girard went to appellant's office on October 18. The receptionist looked over his file, and told him to weigh himself. The agent did so and reported his weight at 190 pounds, fully dressed. The receptionist asked if he desired desoxyn and seconal again and the agent responded affirmatively. The receptionist typed out prescriptions which already bore the signature "J. P. Hooker." Girard paid twenty dollars. Agent Barton returned for a visit on October 23 and asked for the same pills as last time. The doctor looked over the agent's file and stated "there was a lot of heat concerning uppers and downers but that . . . he felt it was appropriate in my particular case." The doctor then took two previously prepared prescriptions (for tuinal and dexedrine) out of Barton's folder, stamped the current date and his office address on each one and handed them to the agent.

◼ Appellant contends that the jury's finding that he violated the Controlled Substances Act, 21 U.S.C. § 801 et seq. ("CSA"), is not supported by the evidence. Specifically, he claims that the CSA necessarily permits considerable discretion to registered physicians [5] in the dispensing of controlled substances in keeping with their professional responsibilities, and that his ac-

5. It was stipulated at trial that appellant "is a licensed physician eligible for his boards in psychiatry, practicing psychiatry, and registered with the Drug Enforcement Agency to prescribe drugs for controlled substances, including the drugs which he prescribed in these cases."

tions fell within this reasonable degree of discretion. Under the circumstances, however, we do not find his claim persuasive.

There can be no question that § 841 of the CSA covers physicians such as appellant. *See United States v. Moore,* 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975). Appellant, however, points to the fact that persons registered under the Act are authorized to dispense and distribute controlled substances, 21 U.S.C. § 822(b).[6] He also stresses that as a duly registered physician, *see* n. 5 *supra,* he cannot be convicted of unlawful distribution unless the government shows beyond a reasonable doubt that his actions were outside the bounds of the professional medical practice.

▆▆▆ We note that while a defendant claiming the benefit of a medical exemption bears the evidentiary burden with respect to its applicability, *see* 21 U.S.C. § 885(c)[7], this does not relieve the government of the task of proving that a practitioner's prescriptions were not " 'issued for a legitimate medical purpose  .  .  .  in the usual course of  .  .  .  professional practice.' " *United States v. Black,* 512 F.2d 864, 871 (9th Cir. 1975). However, our careful examination of the record leads us to conclude that "[t]he evidence presented at trial was sufficient for the jury to find that [appellant's] conduct exceeded the bounds of 'professional practice.' " *United States v. Moore, supra,* 423 U.S. at 142, 96 S.Ct. at 345. "[A]ssuming as we must the truth of the agent[s'] testimony for the purposes of this appeal," *United States v. Badia,* 490 F.2d 296, 299 (1st Cir. 1973), appellant's conduct bore little resemblance to professional practice. He claims that the files he kept on each person to whom he prescribed drugs demonstrate professional procedures, specifically with respect to problems of obe-

sity and insomnia. We disagree. The conversations with the agents clearly indicate that appellant "knew the drugs were not to be used for therapeutic or medical purposes." *United States v. Badia, supra* at 298. Moreover, the government's expert witness, Dr. Renner, a psychiatrist, testified as to the usual medical procedures to be used in prescribing amphetamines for obesity and barbituates for sleeping problems. By contrast the evidence at trial indicates that appellant carried out little more than cursory physical examinations, if any, frequently neglected to inquire as to past medical history, and made little or no exploration of the type of problem a patient allegedly had (which might have served as a basis for determining the propriety of a particular treatment). In light of the conversations with the agents, the jury could reasonably have inferred that the minimal "professional" procedures followed were designed only to give an appearance of propriety to appellant's unlawful distributions. Under these circumstances "[a] medical degree confers no immunity from criminal punishment." *Id.* at 299.

Appellant also contends that the prosecutor, in his closing argument to the jury, made comments which were so prejudicial as to require a mistrial. Each statement allegedly called the jury's attention to appellant's failure to take the stand. Since the judge did not interrupt the prosecutor's summation, instruct the jury on appellant's rights under the fifth amendment, and inform the jury that the prosecutor was guilty of misconduct, appellant maintains that the district court committed reversible error as a matter of law. *See United States v. Flannery,* 451 F.2d 880, 882 (1st Cir. 1971). We disagree. None of the prosecutor's comments, when considered in context, sufficiently called the jury's attention

---

**6.** Section 822(b) provides in pertinent part:

"Persons registered by the Attorney General under this subchapter to manufacture, distribute, or dispense controlled substances are authorized to possess, manufacture, distribute, or dispense such substances  .  .  .."

**7.** 21 U.S.C. § 885(a)(1) provides:

"It shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this title, and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefits."

**306**

to appellant's failure to take the stand to implicate *Flannery's* per se rule. Given the nature of the allegedly improper comments, we think that any errors which occurred were rendered harmless by the cautionary instructions the trial judge gave to the jury.

Four separate prosecutorial remarks are cited as highly prejudicial. The first is as follows:

" . . . Where is the exculpatory evidence? Where is evidence in favor of the defense relative to what [agent] Doyle weighed?"

Appellant contends that this statement improperly calls attention to his failure to testify in his own behalf. Our examination of the statement in context, however, does not bear out this view. The defense position at trial was that appellant was engaged in a valid medical practice involving treatment of "street people," and that the forms and files kept on each "patient" were indicative of this practice. As part of the defense argument, appellant's counsel had stressed the government's failure to introduce "patient files" for any but the four undercover agents who actually had been given prescriptions. In particular the defense alluded to the absence of any file for Agent Doyle who had first gone to appellant's office, and the defense intimated that the file might reveal treatment for a weight problem. Examination of the prosecutor's statement in this context indicates it was directed primarily to the availability of Agent Doyle's file—viz. that it was perhaps more available to the defense or at least "equally available to both sides. . . ." *United States v. Currier*, 454 F.2d 835, 839 (1st Cir. 1972); *cf. United States v. Johnson*, 467 F.2d 804, 808–09 (1st Cir. 1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973). Moreover, after appellant objected to the challenged remark the court promptly gave a cautionary instruction to the jury.[8]

Appellant also finds prejudice in the following remark by the prosecutor:

"Where is there any indication from Donahue [the receptionist] that he informed any of the agents—I am talking about what the agents . . . ."

The prosecutor made this comment in the context of an argument that the agents had not reported appellant ever consulted with his receptionist concerning the various forms and psychological tests the patients were asked to complete. After defense counsel's objection, the trial court cautioned that the comment was only proper if cast in terms of the content of the agents' reports, and warned that "[o]therwise it is an improper argument." The prosecutor then proceeded with his argument, cast entirely in proper terms. Considered in context and in light of the court's instruction "we do not find . . . this particular prosecutorial indiscretion . . . so inherently prejudicial or improper that . . . reversal must result." *United States v. Farnkoff*, 535 F.2d 661 at 668 (1st Cir. 1976).

The third comment to which appellant objects occurred in the context of the prosecutor's argument that the content of the patient files, in particular appellant's handwritten notes on the medical treatment he claims to have offered the agents, was substantially at variance with their testimony. In this regard the prosecutor stated:

" . . . [W]here is the evidence of treatment? The evidence on treatment is here, but nobody . . . ."

At this point defense counsel objected but the court ruled the comment "absolutely proper argument." Under the circumstances we are convinced the court's ruling was not in error as the context indicates the remarks were directed to the agents' testimony concerning their observations of appellant's practices.

Appellant also objects to the prosecutor's characterization during closing argument of the agents' testimony as "unimpeached." He contends that this implicitly constituted a comment on his assertion of

---

8. The trial court cautioned as follows:
   "Well, I think that the jury must understand, and I would instruct the jury that this case is to be decided on evidence which is presented to you and inferences that may properly be drawn from evidence presented."

the fifth amendment privilege. After examining the comments in context we do not find this view persuasive. In closing argument appellant's counsel had contended that the agents conveniently forgot evidence favorable to the doctor; that "[t]hey only see and hear and remember what they feel is good to their side. . . ." In his final argument the prosecutor reviewed the government's evidence in an attempt to establish the accuracy of the reported conversations. In these remarks he stated that despite extensive cross-examination almost all "of what the agents said stands totally unimpeached"; and later he commented that "[t]here is nothing in this case that does anything to those conversations. Those conversations stand unimpeached." Although no objection was made during trial to these remarks, they occurred nearly at the end of the prosecutor's closing argument and appellant moved promptly thereafter for a mistrial, listing these remarks among the grounds for the motion. In denying the request the district court noted that the prosecutor only characterized the agents' testimony as "unimpeached" and that "[h]e did not use uncontroverted." The government emphasizes the same point on this appeal.

 While we have indicated that the government can "focus attention—legitimately—on the absence of impeachment by cross-examination rather than on contradiction by some other witness," *Goitia v. United States*, 409 F.2d 524, 528 (1st Cir. 1969), *cert. denied*, 397 U.S. 906, 90 S.Ct. 896, 25 L.Ed.2d 86 (1970), nevertheless we do not think such a semantic distinction can completely insulate all prosecutorial comments. Persistent emphasis by the government on certain testimony being "unimpeached" in circumstances where there is no one "other than himself whom the defendant [could] call as a witness," *Rodriguez-Sandoval v. United States*, 409 F.2d 529, 531 (1st Cir.

1969), might well create a situation where "the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976) slip op. at 41; *see United States v. Chaney*, 446 F.2d 571, 576 (3d Cir.), *cert. denied*, 404 U.S. 993, 92 S.Ct. 543, 30 L.Ed.2d 546 (1971). Under the circumstances of this case, however, we believe the prosecutor's remarks were sufficiently circumscribed and did not necessarily implicate appellant's assertion of his fifth amendment right. In sum, we conclude that the prosecutor's remarks were not prejudicial,[9] and in view of the fact that the trial court promptly gave cautionary instructions,[10] *see* n. 8 and discussion *supra*; *United States v. Flannery, supra* at 882, we cannot say that appellant was deprived of his right to a fair trial. *See United States v. Farnkoff, supra* at 668.

*Affirmed.*

---

**9.** We must reiterate our warning, however, that a prosecutor "who attempts to define exactly the edge of the precipice approaches at his peril." *Rodriguez-Sandoval v. United States, supra* at 531. *See United States v. Farnkoff*, 535 F.2d 661, 668 & n. 17 (1st Cir. 1976).

**10.** The trial court also repeated these instructions in more extensive form in its charge to the jury.