UNITED STATES of America, Appellee,

v.

Scott DONAHUE, Defendant, Appellant.

No. 75–1416.

United States Court of Appeals,
First Circuit.

Heard Sept. 15, 1976.
Decided Sept. 6, 1977.

Harvey R. Peters, Boston, Mass., argued, with whom Paul T. Smith and Jeffrey M. Smith, Boston, Mass, were on brief, for defendant, appellant.

Charles E. Chase, Asst. U. S. Atty., Boston, Mass., argued, with whom James N. Gabriel, U. S. Atty., Boston, Mass, was on brief, for appellee.

Before * COFFIN, Chief Judge, CAMP-BELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The indictment in this case charged appellant, Scott Donahue, and codefendant J. Perry Hooker with conspiring to distribute Schedule II controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846 and with distributing and aiding and abetting the distribution of the controlled substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Hooker was indicted in 29 counts; Donahue in 19. Tried together, each was separately represented at trial by retained counsel, but the two attorneys were partners in the same law firm. The jury returned verdicts of guilty. Hooker's conviction has since been affirmed. *United States v. Hooker,* 1 Cir., 541 F.2d 300 (1976). After the verdict, but prior to sentencing, appellant, who had retained new counsel, filed a motion for a new trial claiming that

* Mr. Justice Clark of the United States Supreme Court was on the panel when this case was heard but died before the final decision was written.

he was deprived of his constitutional right to the effective assistance of counsel. His supporting affidavit drew into question *inter alia,* whether there had been a conflict of interest on the part of defense counsel. After an evidentiary hearing, the motion was denied. Donahue raises several claims of error on appeal, but we consider only the claim for a new trial based on the fact that appellant and codefendant Hooker were represented by partners in the same law firm.[1]

Our opinion in *Hooker* outlines much of the evidence presented at the trial. Hooker was a licensed physician who was engaged in the practice of psychiatry in the Beacon Hill section of Boston. Testimony by several government undercover agents established that on numerous occasions in 1973 Hooker issued them prescriptions for controlled substances. In affirming his conviction, we held that the evidence was sufficient for the jury to have concluded that Hooker knew the prescribed drugs would not be used for therapeutic or medical purposes and that "the minimal 'professional' procedures followed were designed only to give an appearance of propriety to [Hooker's] unlawful distributions." 541 F.2d at 305. Donahue, a graduate student in counselling psychology, served as the receptionist in Dr. Hooker's office. The Government's case against him was weaker than that against Dr. Hooker. Donahue had more limited contact with the agents, was normally not present when Hooker dealt with them, and as a lay assistant to a physician who was licensed to dispense drugs for proper purposes, would arguably not have appreciated that his employer was acting beyond his lawful authority.

Neither Donahue nor Hooker testified at trial. Their primary defense, based on the testimony of a physician, a psychologist, and a psychiatrist, was that the prescriptions were issued within the bounds of professional medical practice. Mr. Weinberg, on behalf of Donahue, argued this theory to the jury and argued further that even assuming Hooker was engaged in unlawful activity, there was little to suggest that Donahue would have known that Hooker's actions were inconsistent with sound medical practice.

In his affidavit attached to the new trial motion, Donahue asserted that the pre-trial conferences with the firm's assistant handling the case, Mr. Lawson, who was not then a member of the bar, all took place in the presence of Hooker and dealt "almost exclusively" with Hooker's case. He said further that Lawson informed him that the defense strategy was to get Hooker off, which would "automatically" get Donahue off. Donahue averred that he once raised the issue of conflict of interest but was told by Mr. Lawson that there was no conflict and not to worry. He went on to state that he "had fully intended and expected to testify" in his own behalf. At a conference after the second day of trial, at which counsel were deciding whether to put on a defense, Donahue said he inquired as to when he would be discussing his own testimony. Present at the conference were Hooker, Hooker's attorney, Mr. Oteri, his own attorney, Mr. Weinberg, and Mr. Lawson. According to the affidavit, it was Oteri who responded that he had decided that Dona-

---

1. The identity of defense counsel varied during the course of the proceedings, as indicated by the history of the changes in counsel reproduced from appellant's brief:

 "At the arraignment both defendants were represented by Mr. Kevin Keating of the law firm of Crane, Inker & Oteri. Thereafter Mr. Katz of the same firm entered an appearance for both defendants. Mr. Martin Weinberg, also of the same law firm, entered his appearance for both defendants. Thereafter, Mr. Oteri and Mr. Weinberg disassociated themselves from that law firm and formed the law firm of Oteri and Weinberg. At trial,

defendant Donahue was represented by Mr. Weinberg and codefendant Dr. Hooker was represented by Mr. Oteri . . . .."
Various pre-trial motions on behalf of both defendants were signed only by Mr. Weinberg. Mr. Oteri's name first appears on a Motion for Continuance filed two weeks before the scheduled date for trial. While the firm of Crane, Inker & Oteri, with which Messrs. Oteri and Weinberg were then associated, was brought to the attention of both defendants by a friend of Dr. Hooker's, Donahue apparently advanced the $10,000 fee charged by Messrs. Oteri and Weinberg for representing both of them.

hue should not take the stand because he would appear "arrogant". At the hearing, Mr. Lawson testified that he never told Donahue of the possibility of any conflict of interest and never thought any existed. Mr. Weinberg too testified that in his opinion "[t]here was no conflict" and that he never discussed a conflict of interest problem with Donahue. And Mr. Weinberg confirmed that the conference with Donahue after the second day of trial at which defense strategy for the next day was discussed took place in the presence of Hooker and Mr. Oteri and that it was Mr. Oteri who informed Donahue at this time of the decision that he should not testify.

█ The representation of Hooker and Donahue by two law partners raises a serious issue. More than four years ago in *United States v. Foster,* 1 Cir., 469 F.2d 1, 4–5 (1972) we said,

> "[W]here trial commences after the publication date of this opinion, it shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government. . . .
>
> ". . .
>
> "When a satisfactory inquiry does not appear on the record, the burden of persuasion will shift to the government. If the case comes before us on direct appeal, the government will be required to demonstrate from the record that prejudice to the defendant was improbable."

The same rule applies with equal force to representation of two or more defendants by members of the same law firm. *See Commonwealth v. Geraway,* 364 Mass. 168, 301 N.E.2d 814 (1973); *cf. Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir. 1976); *Laskey Bros., Inc. v. Warner Bros. Pictures, Inc.,* 224 F.2d 824 (2d Cir. 1955), *cert. de-nied,* 350 U.S. 932, 76 S.Ct. 300, 100 L.Ed. 814 (1956).

The record shows only one attempt here to comply with the advice required in *Foster.* This came at the arraignment, where both defendants were represented by Mr. Kevin Keating who was later superseded by Messrs. Weinberg and Oteri. The magistrate told Donahue and Hooker "that there is a possibility here, where one attorney represents the same parties and the same indictment, that there is always the possibility of conflict of interest . . . ." Donahue responded that he "understood there is a possibility of conflict of interest" and had raised the matter with Mr. Keating. Asked whether he was satisfied to have Mr. Keating "with that knowledge" [i. e. of the possibility of a conflict], Donahue replied, "I'm really vague about how that mechanism of conflict of interest works. Mr. Keating seems to think that it's fine and I would go along with that, but I'm a little bit vague about just what the conflict of interest might involve." No explanation was thereupon offered. Instead, Mr. Keating represented that in his opinion there was neither a conflict of interest nor even the appearance of a conflict, but offered to inform the defendants and the court if the discovery process revealed the appearance of a real conflict. The magistrate then informed Donahue that there was no conflict "[a]t this hearing this morning . . . but there may be later on", and asked Donahue whether he wished to proceed with Mr. Keating. Donahue gave an affirmative response. No further inquiry was thereafter made prior to verdict. And, as noted above, none of the defense attorneys involved in the case through the trial stage ever discussed the issue of conflict or joint representation with their clients.

When, after conviction, Donahue moved for a new trial, the district court examined the transcript of the arraignment and ruled that there had not been full compliance with the requirements of *Foster.* The court based this conclusion on the magistrate's failure to inquire concerning defendant's understanding that "he could get a separate

lawyer and that if he didn't have sufficient funds that one would be appointed for him." The court then ordered an evidentiary hearing, after which it ruled that "the government demonstrated that prejudice to the defendant [Donahue] was improbable and the unlikelihood of prejudice by reason of the defendant Donahue and codefendant Hooker being represented at trial by members of the same law firm . . . .."

To meet its burden of "demonstrat[ing] from the record that prejudice to the defendant was improbable", *United States v. Foster, supra,* 469 F.2d at 5, the Government makes three points. It argues that the magistrate's inquiry was deficient under *Foster* in only minor respects. It further argues that the evidence shows the improbability of prejudice. Finally, the Government questions whether Donahue could have testified in any way that would have inculpated Hooker but exculpated himself. It urges us to adopt the district court's finding that "the government demonstrated that prejudice to the defendant was improbable".

■■ We are not persuaded. First, we do not agree with the district court's view that the deficiency in the magistrate's inquiry was merely with regard to informing Donahue and Hooker of their right to separate and, if appropriate, appointed counsel.

In *Foster* we required "comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks." Nothing in this regard was provided, and when Donahue said he did not fully understand the notion of "conflict of interest" no explanation was given. Instead, he was simply assured that there was no conflict. We recognize that at the time of arraignment, defendants had not yet solidified their arrangements with counsel. The magistrate perhaps felt that he had done whatever could be done at that early stage, and relied on Mr. Keating's offer to keep the court advised if a conflict should be revealed. It is not enough, however, for the district court to rely on counsel, although, of course, counsel has serious duties in this regard.[2] The court, prior to trial, should have pointed out that for each to be represented by essentially the same lawyers meant that each was foregoing his right to representation by a lawyer whose exclusive loyalty would be to him alone. The court should have advised that it was possible with respect to particular defenses and particular decisions—such as whether or not to take the stand, or to call particular witnesses, or to ask particular questions on cross-examination—that what was in one defendant's

2. Section 3.5(b) of the A.B.A.'s Standards Relating to the Prosecution Function, cited approvingly by the Massachusetts Supreme Judicial Court in *Commonwealth v. Geraway, supra,* states:

"Except for preliminary matters such as initial hearings or applications for bail, a lawyer or lawyers who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants *may* conflict with the duty to another. *The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to act for more than one of several codefendants except in unusual situations when, after careful investigation, it is clear that no conflict is likely to develop and when the several defendants give an informed consent to such multiple representation.*" [Emphasis supplied].

The Code of Professional Responsibility, which the Supreme Judicial Court of Massachusetts has made binding on all members of the Massachusetts Bar (which would include all counsel in this case) contains very similar language. Ethical Consideration 5–15 recognizes that "there are few situations in which [an attorney] would be justified in representing in litigation multiple clients with potentially differing interests". The following Consideration 5–16, states that in those few situations where joint representation may be justified,

"it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent."

The ethical need for disclosure is highlighted by the fact that, as in the present case, there is likely to be a potential attorney-client conflict in the fee situation; if only one client is represented the attorneys lose the fee from representing the other.

best interest would turn out not to be in the other's. Therefore, where the same lawyer or lawyers represented both defendants, counsel might be hampered in carrying out their duties to one client by their duties to the other. The court might also have asked whether the defendants had explored these matters with counsel; and, if necessary, have directed counsel to go over the possible disadvantages of joint representation with their clients, after which the court should have made it a matter of record, after speaking directly to each defendant, that defendant felt he understood the potential dangers of joint representation and still wished to proceed.

Without purporting to prescribe any particular form of words, we emphasize that under *Foster,* the court must explain and explore the risks of joint representation. In the present case, the silence of the court on the subject was rendered the more harmful by the failure of then or subsequent counsel to pursue the matter independently with their clients. While the court's duty to advise under *Foster* exists regardless of whether or not counsel also discusses the matter with their clients, appropriate advice by an attorney would help to minimize any prejudice resulting from the court's silence.

 Since satisfactory inquiry does not appear, we must decide if the Government has demonstrated the improbability of prejudice, bearing in mind that the burden is on the Government to disprove prejudice, not on Donahue to prove it. *United States v. Foster, supra,* 469 F.2d at 5. The district court's findings on that issue are not controlling. We said in *Foster,* that on direct appeal the Government must carry its burden based upon the trial record. The district court's hearing on the motion for new trial is in some respects a useful supplement, but our major focus remains upon the trial record itself. Here we are unable to find that the Government has discharged its burden. To be sure, had Donahue and Hooker each been fully advised, they might have agreed upon a single strategy, on the theory that hanging together would minimize the danger of hanging at all. Counsel has argued that a unified strategy made the most sense. We do not necessarily disagree. But from Donahue's perspective, there was an alternative strategy to be considered which impugned, or at least carried some risk of impugning Hooker.[3] Given the differences between the two defendants—the one an older, experienced physician; the other a young, possibly naive lay person—and the nature of the crimes charged, some attorneys might have thought it best for Donahue to divorce himself entirely from Dr. Hooker, testifying in his own behalf and possibly even taking a position somewhat antagonistic to Hooker.[4] *Cf., e. g., Cavallaro v. United States,* 359 F.Supp. 1276, 1278–79 (D.Conn.1973). A severance might have been pursued. Donahue did in fact manifest a desire to testify on his own behalf. He was, however, discouraged from doing so by the partner who represented Hooker. In weighing one course against the other the calculus would be different from Hooker's point of view than Donahue's, and therein lay the conflict. To Hooker, Donahue's taking the stand might well pose a threat; not only would this highlight Hooker's failure to testify, it would open the possibility that wittingly or unwittingly Donahue would strengthen the case against Hooker.

*Compare Austin v. Erickson,* 477 F.2d 620 (8th Cir. 1973) *with United States v. Georvassilis,* 498 F.2d 883 (6th Cir. 1974).

---

**3.** Although Hooker is not a party to this appeal and did not raise the issue on his own appeal, it is to be doubted that the record would support any claim on his part of ineffective assistance of counsel arising out of his representation by the partner of Donahue's counsel. While Donahue had a number of alternatives, some of them arguably harmful to Hooker, it is not clear that Hooker had any other viable alternatives where his interest would clash with Donahue's. The defense strategy, to the extent it tilted in anyone's favor, was in Hooker's.

**4.** Each count of the indictment charged Donahue and Hooker with violating the federal drug laws "knowingly" and "intentionally". As the charges arose out of improper prescriptions by Hooker, it is reasonable to assume that different proof would be required to establish the necessary element of *mens rea* in the lay assistant than in the doctor.

On this record, we are unable to say that the Government has established an improbability of prejudice. Donahue's conduct suggests that had he been fully advised as to the potential disadvantages, he might have insisted upon separate representation, and hindsight is not a very reliable guide to determining the decisions that might have been made by an attorney whose sole concern was for Donahue rather than for both defendants. *See Austin v. Erickson,* 477 F.2d 620, 624 (8th Cir. 1973). Donahue received neither an attorney with undivided loyalty nor the advice that could have afforded us reasonable assurance that the decision to accept joint representation was an informed one. Where, as here, an alternative strategy—whatever its ultimate merit—plainly existed, and where such a strategy involved, as between the joint defendants, some potential for conflict of interest, we cannot say for sure that the potential conflict did not influence the choices made by those representing both defendants. "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." *Glasser v. United States,* 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942). While Donahue might have acquiesced in representation by counsel who could not give him undivided loyalty, too little was done here to make Donahue aware of the disadvantages of joint representation, and we cannot say with assurance that he did not suffer prejudice as a result of the lack of advice and the representation received. *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Because of the need for a new trial, we need not consider whether the prosecutor's unfortunate remarks would also warrant a new trial, nor need we consider appellant's other claims. Hopefully the Government will not inject such issues in a future trial.

*Reversed.*