

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2008

# USA v. Maynard

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-2889

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Maynard" (2008). *2008 Decisions.* Paper 1218.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1218

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-2889
_____

UNITED STATES OF AMERICA

v.

PAUL MAYNARD,

Appellant.

_____

On Appeal from the United States District Court
for the District of the Virgin Islands
(No. 03-cr-00143)
District Judge:  Hon. Raymond L. Finch

Submitted Under Third Circuit LAR 34.1(a)
May 8, 2008

Before: RENDELL, FUENTES, and CHAGARES, <u>Circuit Judges</u>.
_____

(Filed: May 15, 2008)

Counsel for Appellant
Richard F. Della Ferra (Argued)
Entin & Della Ferra, P.A.
110 Southeast Sixth Street, Suite 1970
Fort Lauderdale, FL 33301

Counsel for Appellee
Kim L. Chisholm (Argued)
Assistant United States Attorney
5500 Veterans Drive, Suite 260
St Thomas, VI 00802

CHAGARES, <u>Circuit</u> <u>Judge</u>.

A jury convicted Paul Maynard of dispensing prescription painkillers outside the usual course of professional medical practice. Maynard now appeals, contending that the jury's verdict was not supported by sufficient evidence. Because there is ample record evidence that could support the jury's conclusion, we will affirm.

I.

Maynard was a licensed physician who practiced medicine on St. Thomas. In 2001, a pharmacist on St. Thomas became suspicious after filling a large number of prescriptions for Dilaudid, a narcotic painkiller, that Maynard had written for one of his patients. The pharmacist alerted law enforcement agencies, who began an undercover investigation into Maynard's practices. On January 25, 2002, DEA Special Agent Michael Poist and U.S. Coast Guard Special Agent Scott Miles went to see Maynard in an attempt to obtain a prescription. After completing forms with fake names, the two entered Maynard's office together, and Poist told Maynard that he wanted a prescription for Vicodin. Maynard asked Poist what was wrong, and Poist replied that "sometimes I had a sore neck and my wrist hurt sometimes." (Feb. 7, 2007 Trial Tr. at 56.) Maynard took Poist's blood pressure, listened to his chest, and took his weight – but did not examine his neck or wrist at all. Maynard then asked Poist and Miles if they "were going to do a deal with the pills. And we just told him no, that we were going to party with

them." (Id. at 57.) Maynard told the agents to be "careful," and then issued the prescription. The agents paid Maynard $100 cash.

Four days later, the two agents went back to Maynard's office. The receptionist told them that it was "too soon" to get another prescription for Poist – so Agent Miles filled out the paperwork instead, and the two agents went in, again together, to see Maynard. Maynard said that it was too early for Poist to get another prescription, and so Miles asked if he "could get some." (Id. at 62.) Maynard asked Miles what ailed him, and Miles replied that he had a toothache. Maynard at first told Miles to go see a dentist, but then said that he would have to do a physical on Miles. The physical consisted – in total – of taking Miles's blood pressure. Maynard then issued Miles a prescription for Vicodin. Again, the agents paid Maynard $100 cash.

On August 19, 2002, Poist returned to Maynard, this time without Miles. Maynard said to Poist, "You're not really sick, are you?" (Id. at 70.) Poist replied that he was there to get his prescription filled again. Maynard did not perform any examination on Poist, but simply wrote out a prescription for Vicodin. Ten days later, Poist returned to Maynard's office. Again Maynard performed no examination, and again he gave Poist a prescription for Vicodin. This time, however, Poist asked Maynard if he "could get some Valium too, just so that I could sleep better," and Maynard complied. (Id. at 73.)

Detective Mark Joseph of the Virgin Islands Police Department also visited Maynard in an undercover capacity. On August 6, 2002, Joseph told Maynard that he was having problems with his girlfriend and that his back hurt. After a cursory examination,

3

during which Maynard weighed Joseph, took his blood pressure, and listened to Joseph's chest and back with a stethoscope, Maynard wrote Joseph a prescription for Vicodin. Maynard did not discuss Joseph's personal history or medical history, did not take x-rays, and did not refer Joseph to a specialist. Three weeks later, Joseph went back to Maynard. Maynard asked him whether his back still hurt, and Joseph said it did not. Maynard wrote him another prescription for Vicodin anyway. On each visit, Joseph paid Maynard cash in his office.

On September 11, 2003, Maynard was indicted on charges of dispensing and distributing controlled substances outside the scope of professional medical practice, in violation of 21 U.S.C. § 841(a)(1). Maynard went to trial in February 2007, and during the trial, the jury heard surreptitious recordings made by the agents during their visits to Maynard's office.

The jury also heard from two expert witnesses. Paul Doering, a Distinguished Service Professor of Pharmacy Practice at the University of Florida, described an analysis he performed of prescriptions Maynard wrote for seven of his patients. Doering concluded that Maynard often issued a patient a subsequent prescription before the previous prescription had run its course, and also frequently prescribed combinations of medicines that could have adverse interactions with one another. He testified that, looking at Maynard's practices "from the perspective of a pharmacist, I'm concerned about the early refills. I'm concerned about the combination and quantities of

4

medications that were issued." (Feb. 9, 2007 Trial Tr. at 61). He described Maynard's prescription practices as "not in the best interest of the patient." (Id. at 62.)

The Government also called Dr. Theodore Parran, a physician specializing in addiction medicine, who is a professor at Case Western Reserve School of Medicine and the founder and director of Case Western's Addiction Fellowship Program. Dr. Parran testified that Schedule II and III narcotic pain relievers such as Vicodin, Percoset, or Oxycontin "tend to be used last" by doctors, because they can be addictive, and because they are often unnecessary. (Id. at 114.) Accordingly, only when all other avenues of pain relief have been exhausted, and the patient is in so much pain that they "still can't function, that typically in the usual course of medical practice is when narcotic pain relievers are added in." (Id.) Dr. Parran opined that "[t]he practice of medicine involves eliciting a full set of data from a patient, both the history data, the old medical records data, what other doctors have done before, and the physical exam data. . . . [T]hat's really what doctoring is all about. . . . [T]hat's expected as a routine course of medical practice." (Id. at 115-17.)

Dr. Parran testified that "prescribing controlled drugs on the first visit, especially very potent Schedule II narcotics on the first visit is pretty uncommon in medical practice." (Id. at 122.) Dr. Parran also stated that to see two unrelated patients at the same time, in the same office visit, "breaks every ethical code of confidentiality of the doctor/patient relationship that exists. That's . . . by definition unacceptable in the practice of medicine." (Id. at 124.) In Dr. Parran's opinion, "[t]here was not a single

5

physical exam done on an undercover agent which would . . .be construed as a physical exam in the usual course of medical practice for a pain complaint. There was not a single history elicited from a patient that could be construed as consistent with what would be necessary. And there was not a single neurologic exam done." (Id. at 138.)

Dr. Parran reviewed prescriptions issued by Maynard, patient records from Maynard's office, and reports or undercover recordings from 19 visits made by Government agents in this case. He made observations and wrote a report summarizing his medical opinions, which, "to a reasonable degree of medical certainty[,] was that there did not appear to be a single case that I reviewed . . . where the prescribing of controlled drugs by Dr. Maynard appeared to have been done within the usual course of medical practice and for a legitimate medical purpose."[1] (Id. at 128-29.)

The jury convicted Maynard of four counts of dispensing a controlled substance outside the usual course of professional practice. The District Court sentenced Maynard

---

[1] Specifically, Dr. Parran identified eight areas of deficiency in Maynard's practice: 1) a lack of old medical records; 2) "a total lack of the initiation of a work-up or a diagnostic evaluation in any chart" (id. at 130); 3) "an exceedingly minimal initial history and physical," to the point that "the histories and physicals that were documented in these charts would not permit a fourth-year medical student to pass the national board exams" (id. at 131); 4) that Maynard never ordered any tests; 5) that Maynard never ordered any consultations with other doctors; 6) that Maynard never ordered any toxicology screens; 7) that Maynard often accepted visits from patients before their prescriptions had expired; and 8) that "the conversations between Maynard and some of the undercover agents were absolutely incompatible with the practice of medicine," as some of the "patients" came in and asked for medicines by name, and Maynard prescribed them "without having a person take off their clothes and do a physical exam, without checking reflexes, without the sort of usual things that we look for when doctoring." Id. at 136.

6

to seven months imprisonment, below the bottom end of his advisory Sentencing Guidelines range of 15 to 21 months imprisonment. This appeal followed.

II.

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

Dr. Maynard must carry an extremely heavy burden to succeed on his appeal. When considering the sufficiency of the evidence supporting a criminal conviction, we must view the evidence in the light most favorable to the Government. See Glasser v. United States, 315 U.S. 60, 80 (1942). Seen in that light, we affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

III.

The Controlled Substances Act (CSA), 21 U.S.C. § 801 et seq., and its implementing regulations govern the manufacture, distribution, and dispensation of all controlled substances in the United States. The CSA divides controlled substances into five categories, according to their properties, and numerous prescription drugs are classified as controlled substances under the CSA. Maynard was convicted under § 841(a)(1), which provides: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally – (1) to manufacture, distribute, dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1).

7

Although the CSA makes exceptions to § 841(a)(1) for physicians and pharmacists who are registered "practitioners," see 21 U.S.C. §§ 821-23, regulations implementing the CSA provide that a person who knowingly issues an "ineffective" prescription "shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." 21 C.F.R. § 1306.04(a). To be "effective," a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." Id. The Supreme Court has held that physicians are subject to criminal liability "when their activities fall outside the usual course of professional practice." United States v. Moore, 423 U.S. 122, 124 (1975).

Thus, "there can be no question that § 841 of the CSA covers physicians" when they prescribe drugs for other than a "legitimate medical purpose in the usual course of professional practice." United States v. Hooker, 541 F.2d 300, 305 (1st Cir. 1976) (quotation marks omitted); see also United States v. Nelson, 383 F.3d 1227, 1231-32 (10th Cir. 2004) ("A practitioner has unlawfully distributed a controlled substance if she prescribes the substance either outside the usual course of medical practice or without a legitimate medical purpose."); United States v. Tran Trong Cuong, 18 F.3d 1132, 1137 (4th Cir. 1994) ("a licensed physician who prescribes controlled substances outside the bounds of his professional medical practice is subject to prosecution"); United States v. Norris, 780 F.2d 1207, 1209 (5th Cir. 1986); United States v. Voorhies, 663 F.2d 30, 33 (6th Cir. 1981); United States v. Tighe, 551 F.2d 18, 21 (3d Cir. 1977) ("by placing a prescription for a controlled substance, issued outside of the usual course of medical

8

practice, in the hands of an ultimate user a physician completes the offense of dispensing under 21 U.S.C. § 841(a)(1).").

On appeal, Maynard argues that he did, in fact, execute each prescription in the usual course of his medical practice. To support this assertion, he claims that his practices met the four requirements set forth in an April 2001 DEA bulletin that dealt primarily with Internet-based pharmaceutical distribution. In that bulletin, entitled "Dispensing and Purchasing Controlled Substances over the Internet," the DEA "intended to provide guidance . . . concerning the application of current laws and regulations as they relate to the use of the Internet for dispensing, purchasing, or importing controlled substances." 66 Fed. Reg. 21,181 (Apr. 27, 2001) (the April 2001 DEA Bulletin). The DEA noted that many states and medical societies required four elements "as an indication that a legitimate doctor/patient relationship has been established." Id. These are: (1) a medical complaint; (2) the taking of a medical history; (3) performance of a physical exam; and (4) a logical connection between the complaint, the history, the exam, and the drug eventually prescribed. See id. at 21,182-83. Maynard points out that he met with each patient, that each patient complained of pain, that he conducted an exam of each patient, and that he reviewed each patient's medical history before prescribing medication. Because he performed these steps, Maynard argues, the evidence presented at his trial was insufficient to support a § 841 conviction.

Maynard's contentions fail for three reasons. First, this case has nothing to do with Internet-based prescriptions. All of the prescriptions that Maynard was convicted

9

for were made during face-to-face encounters between Maynard and the undercover agents. Therefore, the April 2001 DEA Bulletin is of questionable relevance here. Second, the April 2001 DEA Bulletin noted that "[u]nder Federal and state law, for a doctor to be acting in the usual course of professional practice, there must be a bona fide doctor/patient relationship," and that the four elements described above are what "many state authorities" consider to be "an indication that a legitimate doctor/patient relationship has been established." Id. at 21,182. The April 2001 DEA Bulletin does not indicate, however, that the four elements necessarily constitute a bona fide doctor/patient relationship for purposes of the CSA. More importantly, nowhere does the 2001 DEA Bulletin suggest that the term "bona fide doctor/patient relationship" is synonymous with the term "usual course of professional practice." Indeed, it is easy to conceive that not everything a doctor does once a "bona fide doctor/patient relationship" has been established will necessarily fall within the "usual course of professional practice."

Third, we would not reverse even assuming, arguendo, that Maynard is correct, and the four elements listed in the April 2001 DEA Bulletin are completely coterminous with the "usual course of professional practice." Even if that were the case, the jury could find easily, from the evidence put forth by the Government at trial, that Dr. Maynard's practices and procedures failed to meet these elements. Witnesses testified that Maynard did not always take a medical history from his "patients." C.f. 66 Fed. Reg. at 21,182; see Hooker, 541 F.2d at 305 (affirming conviction of physician where "the evidence at trial indicates that appellant carried out little more than cursory physical examinations, if any,

10

frequently neglected to inquire as to past medical history, and made little or no exploration of the type of problem a patient allegedly had"). The jury also heard that Maynard did not always perform a medical exam, that even when he did, the exam was so perfunctory as to be meaningless, and that he neither referred his "patients" to specialists nor required blood work or x-rays. C.f. 66 Fed. Reg. 21,182; see United States v. Johnson, 71 F.3d 539, (6th Cir. 1995) (affirming conviction because Government's evidence included, inter alia, showing that "defendant prescribed narcotics upon request and without medical examinations"); Cuong, 18 F.3d at 1139 (affirming conviction, as based on sufficient evidence, in part because "[m]ost of the [defendant's] patients were given very superficial physical examinations [and not] . . . subjected to x-rays or blood analysis or referred to specialists in an effort to identify and correct the cause of the pain."). Finally, Dr. Parran stated unequivocally that for several patients there was absolutely no connection between the drugs that Maynard provided and the examinations that he performed. Such testimony, by a recognized expert, has been held useful in prosecutions of doctors for dispensing prescriptions improperly. See United States v. Feingold, 454 F.3d 1001, 1007 (9th Cir. 2006) ("only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate wether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal. . . . [Juries must] assess the prevailing standards of care among medical professionals in cases involving the criminal prosecution of licensed practitioners. . . . Knowing how doctors generally ought to act is essential for a jury to

11

determine whether a practitioner has acted not as a doctor, or even as a <u>bad</u> doctor, but as a 'pusher' whose conduct is without a legitimate medical justification.").

As the <u>Hooker</u> Court stated, "the jury could reasonably have inferred that the minimal 'professional' procedures followed were designed only to give an appearance of propriety to appellant's unlawful distributions. Under these circumstances a medical degree confers no immunity from criminal punishment." 541 F.2d at 305 (quotation marks omitted). The jury in this case heard overwhelming evidence that Maynard conducted, at best, only minimal procedures designed to create the veneer of actual examinations. The true practice of medicine, however, consists of far more thorough methods. Accordingly, Maynard's medical degree cannot protect him from application of the CSA to him.

IV.

For the foregoing reasons, we will affirm the decision of the District Court in all respects.