UNITED STATES of America, Appellee,

v.

James MARTORANO, Defendant-Appellant.

No. 78–1445.

United States Court of Appeals, First Circuit.

Argued March 15, 1979.

Decided Dec. 6, 1979.

Rehearing En Banc Granted and Opinion Vacated Jan. 10, 1980.

**38**

Richard J. Vita, Boston, Mass., for defendant-appellant.

Wade Livingston, Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., and Joseph S. Davies, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

* Of the District of Rhode Island, sitting by designation.

BOWNES, Circuit Judge.

In this appeal from the denial of his motion for a new trial, appellant seeks reversal of his extortion conviction on grounds of ineffective assistance of counsel due to joint representation.

Appellant and Brian Halloran were tried together on four counts of extortion in June 1976. The jury acquitted Halloran, but found appellant guilty on all counts. We affirmed appellant's conviction and denied his petition for rehearing. *United States v. Martorano*, 557 F.2d 1 (1st Cir.), *rehearing denied*, # 76–1372 (1st Cir. May 23, 1977) (unpub.) *and* 561 F.2d 406 (1st Cir. 1977), *cert. denied*, 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978).

In February 1978, appellant moved for a new trial on grounds of newly discovered evidence. Because final judgment had been entered more than one year before the motion was filed, a motion for new trial on any other grounds would have been untimely. See Fed.R.Crim.P. 33. Appellant's "newly discovered evidence" was that he had been prejudiced at trial because he and Halloran had been jointly represented by members of the same law firm. This "evidence" was said to be "newly discovered" because appellant did not learn of the prejudice until he obtained new (his present) counsel, which was after his appeal and petition for rehearing had been decided.

The district court held an evidentiary hearing on appellant's motion for a new trial, at which appellant and all counsel involved in his trial testified. In its opinion and order on the motion, the court ruled, as a threshold matter, that it was treating the motion as one to vacate a sentence under 28 U.S.C. § 2255, on the ground that the issue of ineffective assistance due to joint representation does not constitute "newly discovered evidence" within the meaning of Rule 33. As to the merits of the motion, the court found that, prior to his trial, appellant had knowingly waived his sixth amendment right to separate counsel. Because, however, the trial judge had not complied with *United States v. Foster*, 469 F.2d 1, 4–5 (1st

Cir. 1972), by personally addressing appellant concerning his waiver, the district court, in ruling on the motion for a new trial, believed it was necessary to reach the issue whether appellant had been prejudiced by his joint representation and to place the burden of proof on this issue on the government. After reviewing the evidence bearing on the issue of prejudice, the district court ruled that appellant had not been harmed by the fact he had shared trial counsel with Halloran. Accordingly, the court denied appellant's motion for a new trial. *United States v. Martorano,* 457 F.Supp. 803, 810 (D.Mass.1978). This timely appeal followed.

## WAIVER

Appellee argues that since the district court's finding of a knowing and voluntary waiver is supported by the record, we should affirm the denial of the new-trial motion on that ground and not reach the issue of prejudice. Appellant contends that the district court's finding of waiver is erroneous and that, in any event, the issue of prejudice must be reached because the trial judge failed to comply with its duty of inquiry under *Foster.* We agree with the latter portion of appellant's argument.

▆▆ The right to separate counsel, guaranteed by the sixth amendment, is waivable in recognition of the fact that occasionally joint representation can be appropriate or even advantageous to multiple defendants. *United States v. Waldman,* 579 F.2d 649, 651 (1st Cir. 1978). An understanding, or even an awareness, of the risks inherent in joint representation, however, is not a part of the basic knowledge of the average layperson. For this reason, and because waiver of any constitutional right is a serious matter, courts bear a special responsibility in evaluating a criminal defendant's purported waiver of his sixth amendment right to separate counsel. *Id.* In view of this responsibility, in *Foster* we devised a rule under our supervisory powers for district courts to adhere to in evaluating such waivers. The district court's "duty of inquiry" under *Foster* requires a trial court to comment, "as early in the litigation as practicable," on some of the risks indigenous to joint representation and to "inquire diligently" of jointly-represented defendants whether they have discussed these risks with counsel and whether they are aware of their rights to separate (and, if indigent, court-appointed) counsel.[1] 469 F.2d at 5.

It is undisputed that the trial court failed to address appellant about the waiver which appellant filed with the court. The trial court first learned that appellant and Halloran were being represented by two members (Oteri and Weinberg) of the same firm at Halloran's arraignment, which was held several days after appellant's. Upon learning of the joint representation, the magistrate, in recognition of his duty under *Foster,* questioned Halloran about possible conflicts of interest. He then instructed attorney Weinberg, who had accompanied Halloran, to inform Halloran and appellant about their right to separate counsel and, if either defendant wished to waive that right, to have him send a letter of waiver to the court. Appellant was not present at Halloran's arraignment and at no other time during the course of the trial did the magistrate or the trial judge speak to him about his joint representation.

The district court found, however, upon the basis of the evidence presented at the hearing on the motion for a new trial, that appellant did in fact voluntarily and know-

---

1. Since *Foster,* we have expanded the district court's duty of inquiry to require a fuller warning which includes a more detailed explanation of the risks involved in joint representation. *United States v. Donahue,* 560 F.2d 1039, 1043 4 (1st Cir. 1977). This expansion of our supervisory rule does not, however, apply retroactively, *Waldman,* 579 F.2d at 652, so it is inapplicable to the present case in which trial occurred in 1976.

As of August 1, 1979, Rule 44(c), Fed.R. Crim.P., requires district courts to advise jointly-represented defendants about their right to separate representation. The Rule, however, does not require as detailed an inquiry as our supervisory rule which, of course, is controlling in this circuit.

ingly waive his right to separate counsel before he was tried. The evidence upon which the court's finding was based is the following. Shortly after Halloran's arraignment, appellant was called to the office of Oteri and Weinberg. There, Weinberg gave him two letters which Weinberg had drafted, one purporting to be from Oteri to Martorano (advising Martorano of the magistrate's instructions to counsel) and the other from Martorano to the magistrate (stating that appellant was aware of his right to separate counsel and of the risks of joint representation, but that he still wished to retain his present counsel). Appellant was given a few minutes to read these letters, he then signed them, and later Weinberg had the letter to the magistrate filed with the court.

Conflicting evidence was presented at the hearing concerning whether Weinberg ever explained the meaning of the letters to appellant. The district court found that Weinberg did discuss the contents of the letters with appellant and ruled, on the basis of the letters and this discussion, that appellant's letter to the magistrate constituted a knowing and voluntary waiver of appellant's right to conflict-free counsel. Appellee argues that this finding is supported by the record, so there is no need for us to reach the issue of prejudice even though the trial court failed to comply with *Foster*.

■■ The short answer to appellee's argument is that rarely, if ever, will we consider a waiver adequate when the trial court has not met its duty of inquiry under *Foster* (and where applicable, *Donahue,* see note 1 *infra* ), *United States v. Lawriw,* 568 F.2d 98, 105 (8th Cir. 1977), *cert. denied* 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978) (dictum); *cf. Waldman, supra,* 579 F.2d at 651–53 & n.6, and this case does not constitute such a rarity. The purpose of the *Foster* rule is to ensure that there is an on-the-record exchange between the trial court and defendant from which it can readily be inferred that the waiver was voluntary and knowing. In the absence of such an exchange, it is doubtful that the evidence of a valid waiver would ever be so unambiguous that, "indulg[ing] [in] every reasonable presumption" against a finding of waiver, *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we could still affirm a district court's pro-waiver finding.

■ Here, the evidence that appellant's waiver was voluntary and knowing was certainly not unambiguous. The letters which Martorano signed stated that he had been informed of the risks of sharing trial counsel and of his right to separate counsel. These letters, however, do not constitute strong evidence that he understood the dangers involved because they only stated that appellant was "aware" of the "risks" and did not describe any risks.[2] Appellant testi-

2. The letters were as follows:
Dear Jim:
Pursuant to general instructions issued by the Magistrate Willie Davis on September 29, 1975, I advise you as follows pursuant to the rules articulated by the United States Court of Appeals for the First Circuit in a case styled *United States v. Foster,* 469 F.2d 1. As you know, I represent both yourself and Brian Halloran in the above-captioned matter. The *Foster* case held that there were dangers to criminal defendants like yourselves inherent in any joint representation. The Court asked me to advise you of the risks involved in joint representation so that you would be aware of these risks and, would if you wished, retain separate counsel.

I enclose for your consideration the following letter which I have authored on your behalf which, if it conforms to your desires,

may be signed by you and forwarded back to me for the purposes of sending to the Court to satisfy its burden under the *Foster* case of ascertaining whether or not you are conscious and aware of the fact that you may retain separate counsel and may be prejudiced by joint representation.

Sincerely,
Joseph S. Oteri

Dear Magistrate Davis:
Pursuant to your instructions of September 29, 1975, I state to you that I am aware of the dangers which exist to criminal defendants and which are inherent in joint representation. I have discussed these risks with my attorney, Joseph S. Oteri, and I understand that I may retain separate counsel or if I qualify as an indigent I may have such coun-

fied, as did attorneys Oteri and Weinberg, that he never did discuss the contents of the letters with his attorneys. Counsel believed that there were no conflicts of interest between Halloran and appellant. Thus, they viewed the preparation of the letters as a mere technicality to ensure, in view of the magistrate's instructions, their continued representation of appellant and Halloran. Appellant testified that, given this attitude of counsel towards the letters, he felt no need to satisfy himself as to their meaning before signing them. Due to this conflicting evidence concerning the validity of appellant's waiver, the district court was correct in proceeding to consider the issue of prejudice and in placing the burden of proof on appellee.[3]

## PREJUDICE

■ Citing to *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), appellant argues that, when a jointly-represented defendant has not voluntarily and knowingly waived his right to separate counsel, we should find prejudice as a matter of course. This issue was not raised below. Therefore, only if a failure to consider the issue would result in manifest injustice, do we need to reach it. *See, e. g., United States v. Emery,* 541 F.2d 887, 889 n.3 (1st Cir. 1976).

We declined to adopt the per se rule appellant desires in *Foster,* 469 F.2d at 5, and do not read *Holloway* as requiring us to reconsider that decision.[4] It is true that this is the second post-*Foster* trial of which we are aware in which the trial court failed to adhere to our supervisory rule concerning waiver, thereby requiring us to analyze a lengthy trial record and engage in "the impossible task of speculating about what might have happened" had appellant had his own lawyer.[5] *Lollar v. United States,* 126 U.S.App.D.C. 200, 205, 376 F.2d 243, 248 (D.C.Cir.1967) (C. J. Bazelon, dissenting). Both trials occurred, however, in 1976 before our opinion in *Donahue* in which we stressed how important we viewed compliance with the rule on waiver to be. Thus, it is not apparent at this time that a per se rule is necessary to encourage such compliance. *Compare United States v. Scott,* 583 F.2d 362, 364 (7th Cir. 1978) (en banc as to adoption of per se rule). In sum, we see no reason to reconsider in this appeal whether a per se rule should be adopted.

■ In *Foster* we ruled that where a satisfactory inquiry into waiver does not appear on the trial record, the government bears the burden of persuasion on the issue of prejudice. The government must "dem-

---

sel appointed for me by the Court. I am mindful of the risks and dangers of joint representation and I desire for Mr. Oteri to continue to represent me despite these risks and despite my knowledge that his office also represents a co-defendant in the above-captioned matter.

Sincerely,

James Martorano

3. Defense counsels' failure to explain the risks of joint representation fell below the standards established for members of the Massachusetts bar by the Code of Professional Responsibility. *Donahue, supra,* 560 F.2d at 1043 n.2 ("in those few situations where joint representation may be justified, . . . . 'a lawyer . . . should explain *fully* to each client the implications of the common representation and should accept or continue employment only if the client consents.'" (emphasis added). Furthermore, these same attorneys were trial defense

counsel in *Donahue,* another case which required a new trial because of prejudice arising from joint representation. We might have referred these matters to a disciplinary committee except that both appellant's and Donahue's trials occurred at about the same time and before our decision in *Donahue* issued. At the post-Donahue hearing on appellant's motion for a new trial, both defense counsel testified that in light of *Donahue* they no longer represent more than one defendant at a trial.

4. In *Holloway* the Court held that, when a trial court fails to give due consideration to a court-appointed defense counsel's contention that the defendants he is jointly-representing have conflicting interests, reversal of the defendants' convictions is automatically required. 435 U.S. at 488, 98 S.Ct. 1173.

5. The first trial was *Donahue.*

onstrate from the record that prejudice to the defendant was improbable" if the issue is raised by way of a direct appeal from a conviction. "If the issue arises in the context of a [28 U.S.C.] § 2255 motion, the government will bear the burden of establishing the unlikelihood of prejudice by a preponderance of the evidence." 469 F.2d at 5.

Appellee contends that the district court properly treated appellant's motion for a new trial as a § 2255 motion. Thus, appellee argues, it need only prove "the unlikelihood of prejudice by a preponderance of the evidence." Appellant argues that the district court erred in treating its motion as a motion to vacate sentence under § 2255. Therefore, the government must prove that prejudice was "improbable."

The issue whether ineffective assistance can ever properly be raised in a motion for new trial on grounds of newly discovered evidence is an open question in this circuit, *United States v. Carlson*, 561 F.2d 105, 109 (1st Cir.), *cert. denied* 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977); *United States v. McCambridge*, 551 F.2d 865, 873 (1st Cir. 1977) which will not be resolved here, for whichever standard we apply our decision on the issue of prejudice remains the same.

Appellant points to three of defense counsel's tactical decisions as indicating that his interests, in terms of which defense strategy to pursue, conflicted with Halloran's and that defense counsel consistently chose the tactics which benefitted Halloran. Defense counsels' reasons for so proceeding were, according to appellant, their theory of defense that, if Halloran was acquitted, appellant's acquittal would automatically follow and their preference for Halloran due to their longer association with him.

The three decisions which allegedly benefitted Halloran at appellant's expense were defense counsel's insistence that appellant testify, their decision that Halloran not testify, and their refusal to call Louis Pallotta. Counsels' decision not to call Pallotta constitutes sufficient evidence of prejudice to require a new trial. Hence, we need not consider whether counsels' other tactics also resulted in prejudice to appellant.

■ Appellant contends that, if Louis Pallotta had testified, he would have corroborated appellant's version of the loan transaction and rebutted the version of the government's chief witness, Louis' brother, Peter Pallotta. Appellant thought it would be very effective to have Peter contradicted by his own brother. For these reasons, appellant continually urged defense counsel to call Louis. Louis was not called, however, because defense counsel, according to appellant, feared that the prosecution would on cross-examination of Louis elicit testimony damaging to Halloran. Appellee argues that even a defense counsel loyal only to appellant would not have called Louis because his credibility was so open to attack.

In determining whether the decision not to call Louis indicates that appellant was prejudiced by his joint representation we consider whether, in terms of appellant's defense, calling Louis was "an alternate strategy [which]—whatever its ultimate merit—plainly existed" and whether it "involved, as between the joint defendants, some potential for conflict of interest . . . ." *Donahue*, 560 F.2d at 1045.

On the basis of our review of the trial record we find that calling Louis was "an alternate strategy [which]—whatever its ultimate merit—plainly existed." In other words, an attorney representing only appellant might reasonably have pursued this strategy. After the government rested its case-in-chief, any competent defense counsel would have realized that for appellant to have any chance of being acquitted, he had to put on some kind of defense. The victim of the alleged extortion scheme, Peter Pallotta, has testified in detail about how appellant had lent him $2000 at extortionate rates, how, after Peter defaulted, appellant had threatened him with harm, and how appellant had sent Halloran to rob Peter's nightclub to recover overdue interest payments. It is true that Peter's credibility was vigorously attacked on cross-examina-

tion [6] but the government's case against appellant did not rest on Peter's testimony alone. The government also admitted a taped telephone conversation between appellant and Peter in which appellant's statements practically constituted admissions of guilt.[7] Therefore, as appellant's trial counsel recognized, they could not rest without putting in some kind of defense.

Calling Louis Pallotta, however, was not defense counsels' only choice in terms of putting on a defense for appellant. Counsel had reason to believe that appellant would make a good witness. One-half of his criminal record was already in evidence and the other half was relatively minor, so the fact that appellant's record would probably be revealed to the jury if he testified was not a major drawback to calling appellant. Counsel believed that appellant was charming, articulate, intelligent, and had the appearance of a business man. They knew that appellant was a family man, had been steadily employed for the last few years, and had recently earned a B.S. degree by going to Boston College nights. Furthermore, appellant was the only person who could attempt to explain away his statements on the tape because the recorded conversation admitted in evidence had been solely between Peter and himself. Therefore, defense counsel would have been foolish not to call, and in fact did call,

appellant for purposes of presenting a defense on his own behalf.

Since calling appellant to testify was a reasonable strategy to pursue, defense counsel were not faced with a situation where calling Louis was realistically their only choice in terms of presenting a defense for appellant. Still, we cannot say on the basis of the record before us that it would have been unreasonable for an attorney representing only appellant to have called Louis as well. Louis was the only other person present besides Peter and appellant when the loan was negotiated. If he had been called, he would have corroborated appellant's version of these negotiations and rebutted Peter's. Appellant had testified that the loan had been made to his good friend, Louis, not to Peter, whom he met for the first time that day, that Peter accompanied Louis because Louis thought appellant might be able to give Peter some advice on an unrelated matter, and that the loan to Louis was interest-free and without definite terms as to repayment. Louis, according to appellant, repaid the loan within a few weeks, before the date on which appellant allegedly had Halloran rob Peter's club. If Louis had testified, he would have corroborated this version of the loan transaction, rather than Peter's. Although the government's case against appellant was strong, this corroboration of appellant's tes-

**6.** On direct examination Peter informed the jury about his lengthy criminal record. On cross, testimony was elicited from Peter from which it could be inferred that he had fabricated his allegations against Halloran and appellant in order to obtain government protection. According to Peter's testimony, he was in default on loans from other alleged loan sharks, an arrest warrant for him was outstanding in Massachusetts for failure to pay child support, and he had committed numerous parole violations which, if discovered by the proper authorities, would result in a minimum jail term of seven years. Other portions of Peter's testimony on cross indicated that he thought all of these problems would be "cured" if he assisted the government in preparing a case against Halloran and appellant.

**7.** The telephone conversation initiated by Peter and recorded with his permission was as follows:

Peter: Jimmy [appellant], I ain't got any money. I'm trying to put something together.

Appellant: Oh, why don't you stop by and see me.

Peter: I'm afraid to go down there, you know that.

Appellant: You don't have to be afraid to come down to see me.

Peter: I'm afraid I'll wind up gettin' slapped in the face.

Appellant: Nothin's gonna happen.

Peter: Huh?

Appellant: Don't talk like that on the phone.

Peter: Oh, all right. All right, can I meet you somewhere else?

Appellant: You can come any time. What do you think I'm gonna do something 'round my own place? Be kind of stupid wouldn't it? Ah, first chance you get drop by and see me, all right?

Peter: Okay. All right, Jim.

timony might have made the difference in the jury's decision as to whether appellant was guilty "beyond a reasonable doubt."

It is true, as appellee argues, that calling Louis was a risk because the prosecution was aware that Louis had a history of mental health problems and had made a prior inconsistent statement to the F.B.I. Thus, defense counsel were properly concerned that Louis' credibility might have been destroyed during cross examination, which could then have led to a weakening of appellant's credibility in the eyes of the jury. Still, there is no evidence in the record indicating that Louis could not have overcome his credibility problems. For all we know his mental health problems might have had no bearing on his ability to tell the truth or to give a reliable account of the loan transaction. Moreover, there is no evidence indicating that Louis could not have persuaded the jurors that his prior statement to the F.B.I. was false and that they should believe his testimony at trial. It is possible that Louis lied to the F.B.I. on impulse to protect his brother (who had already agreed to "cooperate" with the F.B.I. in building a case against appellant), but then later decided to tell the truth even though he would be contradicting his brother by doing so. The question of credibility is always an iffy one. The only way appellant's testimony about the terms of the loan could have been corroborated was through Louis. We have no reason to doubt that calling him would have been an acceptable risk. In sum, on the basis of the record before us, we cannot say with any assurance that an attorney representing only appellant would not reasonably have called Louis to strengthen the defense. Thus, calling Louis was "an alternate strategy [which]—whatever its ultimate merit— plainly existed" in terms of making a case for appellant.

We next consider whether, as between Halloran and appellant, there was a potential for conflict in calling Louis. In other words, since calling Louis was not an unreasonable strategy in terms of appellant's defense, we consider whether it might have been an unwise tactic in terms of Halloran's defense.

It is undisputed that Louis could not have given any testimony that would have directly benefitted Halloran because Louis had no personal knowledge concerning Halloran's alleged involvement in the extortion scheme. Moreover, there is evidence that calling Louis might have harmed Halloran. At the hearing on appellant's motion for a new trial appellant testified that defense counsel told him they were not going to call Louis because they feared that on cross examination of Louis the prosecution would elicit damaging evidence with regard to Halloran's reputation and character. Attorney Weinberg admitted that this was one reason why Louis was not called. A review of the trial record corroborates the testimony at this hearing that calling Louis might have harmed Halloran.

During the government's case-in-chief at appellant's trial, Peter Pallotta had testified that he was afraid of Halloran because he knew Halloran was "a loan shark, collector, and enforcer and a madman" and "if you didn't . . . pay [him] you would get a beating or maybe worse." However, because Peter had been subjected to vigorous cross examination, see note 6 *supra,* his testimony alone did not constitute overwhelming evidence against Halloran. Furthermore, the government had not been successful in admitting any other evidence (e. g., a taped conversation) against Halloran. Therefore, it is probable that a major concern of any attorney representing Halloran would have been to prevent any damaging evidence from coming in against Halloran during the presentation of the defense. In view of Louis' expected testimony on cross, corroborating Peter's testimony about Halloran's reputation and character, a defense attorney representing Halloran would not only not have called Louis, but would have been concerned to hear that he would be called by a codefendant. Thus, calling Louis would have involved, "as between the joint defendants, [a] potential for conflict of interest." *Donahue,* 560 F.2d at 1045. Given this fact and the fact that calling Louis was "an alternate strategy [which]—whatever its ultimate merit—plainly existed" for appellant, *id.,* appellee has not established that prejudice to appellant arising from his

joint representation was improbable. Moreover, there is enough evidence of a conflict here so we also cannot say that appellee has proven the unlikelihood of prejudice by a preponderance of the evidence. Hence, we reverse appellant's conviction and remand for a new trial.

Having found that appellant is entitled to a new trial we need not reach the issue whether the district court erred in refusing to recuse itself from considering appellant's motion.

*Reversed and remanded.*

COFFIN, Chief Judge (dissenting).

While I am uncomfortable with the court's holding that appellant, a college graduate and sophisticated businessman, did not waive his right to conflict-free counsel, I can see the value of generally requiring an on-the-record exchange between court and defendant. I can therefore accept the court's holding on waiver.

My problem materializes when I consider the question of prejudice. The court's opinion seizes on the decision not to call Louis Pallotta as sufficient evidence of prejudice to require a new trial. It notes appellant's arguments that Pallotta would have corroborated appellant's version of the loan transaction, rebutting his brother Peter, which would have been helpful; and that defense counsel refused to call Pallotta because cross-examination would elicit testimony damaging to Halloran.

The standard adopted by the court's opinion is, to quote from *United States v. Donahue,* 560 F.2d 1039, 1045 (1st Cir. 1977), whether the action (i. e., calling Louis Pallotta as a witness) was "an alternate strategy [which]—whatever its ultimate merit— plainly existed." The court's opinion obviously assumed this standard was met.

The trial court, however, made these findings—that Louis Pallotta would be a liability to both appellant and Halloran; that Pallotta had made a prior statement to the FBI flatly contradicting any exculpatory testimony he might have given for the defense; that he had a lengthy psychiatric history including diagnosis as a paranoid schizophrenic; that Halloran ran less risk of

embarrassment from Pallotta's testifying, because of prior inconsistencies, than did appellant; that after a trial run at testifying Martorano's lawyer thought Pallotta to be a "terrible witness". The court concluded that "there is no reason in the world to speculate that separate counsel would have analyzed the potential impact of Louis Pallotta's testimony any differently" than did appellant's counsel.

These observations I think it important to note, are not evaluations of strategy, where our hindsight judgments might well be as valid as those of the trial court. They are the clearest indicia of the vulnerability of Pallotta's credibility. I see absolutely no basis for disagreement with the trial judge and cannot see how the court can say: "We have no reason to doubt that calling him [Pallotta] would have been an acceptable risk."

In short, I would hold that the government has more than adequately sustained its burden of demonstrating that "prejudice to the defendant was improbable". *United States v. Foster,* 469 F.2d 1, 5 (1st Cir. 1972). It seems to me that the court, in holding that calling Louis Pallotta was a strategy that "plainly existed", may well be taking too literally the caveat in *Donahue,* "whatever its ultimate merit", and therefore is confusing the ability to articulate a strategy with a realistic chance to pursue one. Such a reading, of course, would entirely eviscerate the standard of probability of prejudice established in *Foster.* I fear that the court's approach in this case comes too close to adopting a per se rule of prejudice in all cases where conflict is not waived.

## ORDER OF COURT

A majority of the judges in regular active service on this Court having voted for a rehearing en banc,

The opinion of the Court filed on December 6, 1979, is withdrawn and the judgment entered on said date is vacated;

The petition for release on bail is denied; and

This case is assigned for rehearing en banc on Friday, February 1, 1980.